IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| BRIAN ASHLEY WHITFIELD | § | |
| | § | CIVIL ACTION NO. 6:05cv246 |
| BERTO CLARK, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

    The plaintiff Brian Whitfield, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in the proceeding pursuant to 28 U.S.C. 636(c).

    An evidentiary hearing was conducted on October 18, 2005, pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985). At this hearing, Whitfield testified that on June 29, 2004, he was placed in safekeeping at the Michael Unit, on 11 Building. When he arrived at the unit, Whitfield said, he went before the Unit Classification Committee and told them that he believed that an inmate named Roberto Martinez, an enemy, was on the unit, and Warden Caffrey ordered that he be placed on 11 Building pending an investigation.

    When he was taken to 11 Building, Whitfield said, there were no empty cells, so he was placed in the dayroom. Officers Clark, Moore, and Mayfield were working on 11 Building. There were two support service inmates (SSI's) working in the dayroom, named Landrum and Arthur. When Whitfield was put in the dayroom, Arthur left.

    Whitfield testified that Landrum began talking to him, asking his name and where he was from. However, Landrum then began asking him about homosexuality and about Whitfield performing sex acts upon him. Whitfield says that he pushed the intercom button and told Officer

Moore about what was going on, and asked to be placed in a cell. Clark and Mayfield came to the dayroom, and he told Mayfield what was going on. She told Landrum to leave the dayroom and go to a storage closet down the hall. Landrum left the dayroom, but said "I'm gonna get me some of that," while pointing at Whitfield. Clark told Landrum that he was "gross" and told him to be on his way. Landrum did leave, but came back by a couple of times, making comments about "getting some ass," but Whitfield says that Clark just laughed.

After spending about 45 minutes in the dayroom, Whitfield says, he was put in a cell. He told Officer Clark that he had not eaten, and she said that she had to get trays for Whitfield and for the inmate in 26 Cell. Clark and Mayfield then left the area. Moore announced over the intercom that the security gate was left open, but Clark said that they were going to be right back.

Whitfield stated that he was sitting on the floor of his cell unpacking his property. He called out on the run, asking if anyone had an envelope that he could use to write to his family. The inmate in 17 Cell said that he had one. Whitfield caught a glimpse of an SSI, but not realize that it was Landrum. He said that Landrum brought the envelope to his cell, and Whitfield crawled over to the door to get it. Landrum removed his penis from his pants and asked for oral sex. When Whitfield reached for the envelope, Landrum grabbed him by the hair and slammed his head into the door. Whitfield said that he tried to pull back, but Landrum held onto his hair and slammed his face repeatedly into the bars. Whitfield said that he was afraid of being hurt further, so he put his mouth on Landrum's penis. However, he said that Landrum could not obtain the type of satisfaction that he wanted, so he, Landrum, ended by masturbating on Whitfield's face, apparently while still somehow holding onto Whitfield's head.

After this happened, Whitfield said, he sat on the floor crying. Another inmate asked what had happened and called for the guards. When Officer Clark came back with the tray, he told her what had happened, but she said "oh please," set the tray in the slot, and closed the cell's solid outer door.

2

Whitfield stated that he beat on the cell door with the tray after it was closed. Some three and a half to four hours later, Captain Partin came down. Whitfield told Partin what had happened, and Partin asked Clark where the SSI was. Clark said that he was downstairs. Whitfield says that Clark told Partin that Landrum was never unattended and that he, Landrum, was always in the line of sight of one of the officers. Clark also denied that the security gate had been left open. Partin said that if Whitfield was lying, he would get a case. He was taken to the medical department and found to have a broken tooth, a busted lip, and crusting from semen around his mouth.

Whitfield says that he saw the psychiatric department and the contagious disease department. He says that Captain Partin told Landrum to go home and take a shower. Whitfield also says that his mouth was swabbed out.

At the hearing, Whitfield said that he wanted to amend his complaint to change the Texas Department of Criminal Justice to Gary Johnson, the Director of TDCJ-CID, and the Board of Corrections to Christina Melton-Crain, a board member. He also said that he wanted to add the University of Texas Medical Branch and Warden Thompson to the lawsuit as defendants. Whitfield explained that he went before the Unit Classification Committee for a life endangerment investigation, but when he got there, Thompson ordered him to sign a waiver of liability and he refused. Thompson then ordered another officer to give Whitfield a disciplinary case for trafficking and trading, for taking the envelope. Whitfield protested that it was July 6, and the incident supposedly happened on June 29, and Thompson said that he did not care. Whitfield pointed out that the inmate who had given him in the envelope did not get a case, and Landrum, who had carried the envelope to Whitfield's cell, did not get a case. He was found guilty of trafficking and trading; Whitfield says that this was due to retaliation for refusing to sign the waiver of liability form, which he says would have asked that no further action be taken on his complaint.

Warden Pratt, a TDCJ-CID warden present at the Spears hearing, gave sworn testimony that if an inmate is put in 11 Building, he is not supposed to be mixed with general population inmates.

He acknowledged that support service inmates could be in the dayroom to clean it. Pratt also said that normally, an inmate not housed in 11 Building would not be put in the dayroom there.

Chip Satterwhite, a TDCJ-CID Regional Grievance Coordinator, said that Whitfield filed a grievance regarding the incident, but that this was filed in March of 2005. Whitfield said that he filed a Step One grievance which was accepted, but then returned as inappropriate. He says that he did not get this Step One back until September, and that he filed a Step Two in August, but it was rejected because he did not have the Step One. Whitfield also said that he had filed at least six grievances complaining of the sexual assault.

Whitfield's original and amended complaints essentially repeat the allegations which he made at the Spears hearing, except that the facts regarding the envelope are not mentioned; he simply says that he was grabbed through the door.

Whitfield's medical records show that he was seen in the clinic on June 29, 2004, with a complaint of having been sexually assaulted. Whitfield told the medical staff that he went to the cell door to get a blanket from the SSI, who asked if he, Whitfield, was "gay," and Whitfield said that he was. The SSI then grabbed him by the hair and forced him to perform oral sex. The medical exam showed that Whitfield was alert and oriented, agitated yet relatively calm. He complained that he had semen on his hands, face, and mouth, and there was crusting noted around his lips, mouth, and tongue. His throat was red and one front tooth was chipped on the lower right corner. The medical records state that a smear was performed and saliva and oral swabs were obtained.[1] Whitfield was also tested for HIV and hepatitis, which tests proved negative.

Whitfield saw the mental health department that day. He told the interviewer that he asked the SSI for an envelope, and the SSI grabbed his hair through the bars and forced him to perform oral sex. The interviewer noted that Whitfield's mood and affect were incongruous with the events described and stated that Whitfield had a history of fabricating sexual incidents to get off prior units.

---

[1] The records furnished to the Court do not indicate what results, if any, were obtained from the swabs.

However, the Court will take Whitfield's pleadings and testimony as true, disregarding any information in the records which factually contradicts his testimony. *See* Varnado v. Collins, 920 F.2d 320, 321 (5th Cir. 1991).

## Legal Standards and Analysis

The primary defendants named in the lawsuit are Officers Clark, Moore, and Mayfield. Whitfield's claim is in effect that these officers were deliberately indifferent to his safety.

The Fifth Circuit has held that prison officials have a duty not to be deliberately indifferent to the safety of their inmates. Johnston v. Lucas, 786 F.2d 1254, 1260 (5th Cir. 1986); Jacquez v. Procunier, 801 F.2d 789, 792 (5th Cir. 1986). A showing of mere negligent indifference is not enough for a constitutional claim. Davidson v. Cannon, 474 U.S. 344 (1986).

In Davidson, the Supreme Court faced the issue of what constitutes deliberate indifference to an inmate's safety. There, an inmate named Davidson was threatened by another inmate, McMillian. Davidson sent a note to the Assistant Superintendent of the prison, Cannon. Cannon passed the note to a guard named James. James, however, left the note on his desk and later forgot about it. McMillian later assaulted Davidson, causing serious injuries.

The Supreme Court acknowledged that the Defendants' lack of due care resulted in serious injury, but held that the lack of due care alone did not approach the sort of abusive governmental conduct that the Due Process Clause was designed to prevent. The Court emphasized that negligence alone was insufficient to trigger the protections of the Fourteenth Amendment. Davidson, 474 U.S. at 347-48.

The Supreme Court specifically addressed the issue of deliberate indifference to an inmate's safety in prison in Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970 (1994). The Court explained that

> [A] prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. ...

> But an official's failure to alleviate a significant risk which he should have perceived, but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

Farmer v. Brennan, 511 U.S. at 837-38, 114 S.Ct. at 1979; see Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994).

In this regard, the Fifth Circuit has explained that prison officials have a duty to protect inmates from violence at the hands of other prisoners; however, not every injury suffered by a prisoner at the hands of another rises to the level of a constitutional violation. Horton v. Cockrell, 70 F.3d 397, 400 (5th Cir. 1995). The plaintiff prisoner must prove both that he is incarcerated under conditions "posing a substantial risk of serious harm" and that the prison official's state of mind is one of "deliberate indifference" to the inmate's health or safety. Horton, 70 F.3d at 401, *citing* Farmer, 114 S.Ct. at 1977.

In this case, Whitfield's testimony shows that when he was first accosted by Landrum in the dayroom, he complained to the officers and they ordered Landrum to leave. Whitfield was then placed in a cell *with the door closed and locked*. When Clark and Mayfield left to get the trays, they did so with the knowledge that Whitfield was safely locked inside of a cell. Even though Landrum was present on the wing, the possibility that Whitfield would be sexually assaulted through a locked door was hardly a reasonably foreseeable danger. While leaving the security gate open, or Moore's failing to notice what was going on, may have been negligence or a lack of due care, Whitfield has failed to show that these officers acted with deliberate indifference to his safety; he has not shown that the officers were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, or that they drew that inference. Instead, the salient fact of which the officers were aware was that Whitfield had been safely placed inside of a locked cell.

Similarly, Whitfield has failed to show that the officers were deliberately indifferent towards him after the incident. He says that Officer Clark expressed skepticism when she brought his tray and he told her that he had been assaulted, but he does not dispute that she was standing at the cell door and could see that it was still locked. Whitfield further concedes that he was taken to the

6

medical department and examined a short time after the incident occurred. Even if the officers told Captain Partin that the security gate was not left open and that Landrum had remained in sight, which statements were not true, Whitfield has failed to show that these prevarications amounted to deliberate indifference to his safety. The officers made provisions for Whitfield's safety by placing him inside a closed and locked cell. He voluntarily approached the door of the cell while an unidentified inmate was standing there, despite knowing that he had received threats from an SSI on that wing less than an hour before. Whitfield has failed to show that Clark, Moore, or Mayfield were deliberately indifferent to his safety, and his claims against them are without merit.

Whitfield also sued Warden Thompson for allegedly retaliating against him by ordering that a disciplinary case be written after Whitfield refused to sign a form. This disciplinary case was for trafficking and trading, in that Whitfield had asked for and received an envelope from another inmate.

The TDCJ-CID disciplinary rules define trafficking and trading as "the unauthorized buying, selling, exchange or transfer of any commodity from any individual, other than making authorized purchases from the commissary." *See* TDCJ Disciplinary Rules and Procedures for Offenders, January 2005 ed., p. 26  (available on-line at http://www.tdcj.state.tx.us/publications/cid/publications-cid-disciplinary-rules-offenders.htm). Whitfield has failed to show that the transfer of the envelope to him was authorized, or that his asking for and receiving the envelope from another inmate otherwise fell outside of the definition of trafficking and trading.

As a general rule, a prisoner who asserts a retaliation claim must assert specific facts; mere conclusory allegations are not enough. Whittington v. Lynaugh, 842 F.2d 818, 820 (5th Cir. 1988); Moody v. Baker, 857 F.2d 256, 258 (5th Cir. 1988). The Fifth Circuit has held that the elements of a claim under a theory of retaliation are the invocation of a specific constitutional right, the defendant's intent to retaliate against the plaintiff for his exercise of that right, a retaliatory adverse act, and causation, which is a showing that but for the retaliatory motive, the action complained of would not have occurred. Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997). The relevant

showing must be more than the prisoner's personal belief that he is the victim of retaliation. Johnson, 110 F.3d at 310, *citing* Woods v. Edwards, 51 F.3d 577, 580 (5th Cir. 1995).

The Fifth Circuit has cautioned as follows:

> The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties. Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions.

Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995). The Court went on to explain that district courts must "carefully scrutinize" claims of retaliation in order to ensure that prisoners do not "inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around themselves." Woods, 60 F.3d at 1166; *accord*, Orebaugh v. Caspari, 910 F.2d 526, 528 (8th Cir. 1990) (noting that "while a prisoner can state a claim of retaliation by alleging that disciplinary actions were based upon false allegations, no claim can be stated when the alleged retaliation arose from discipline imparted for acts that a prisoner was not entitled to perform."). As the Eighth Circuit explained, any other rule would allow a prisoner to openly flout prison regulations after filing a grievance and then bring a claim under Section 1983 arguing that prison officials disciplined him in retaliation for filing a grievance. Orebaugh, 910 F.3d at 528.

In this case, the alleged retaliation arose from discipline imparted for an act which Whitfield was not entitled to perform: the obtaining of an envelope by trafficking and trading with another inmate. The disciplinary offense report form says that while Whitfield was being taken to a reclassification hearing, he admitted that he had traded with another inmate for an envelope. The account of the hearing says that Whitfield stated that he traded for an envelope to write home. Whitfield does not dispute that his action in doing so violated TDCJ-CID regulations.

Hence, Whitfield has failed to set forth a valid retaliation claim, because he has not satisfied the causation element. In other words, Whitfield has not shown that but for the alleged retaliatory motive, he would not have received a disciplinary case for a violation which he admitted committing. His claim against Warden Thompson is without merit.

Whitfield named Gary Johnson, the Director of TDCJ-CID, as a substitute for TDCJ-CID in his amended complaint and at the Spears hearing. He explained in his amended complaint that he wrote a letter to Johnson requesting assistance in obtaining medical care for his tooth, but Johnson never responded.

The mere fact that correspondence was sent to the Director of the Texas Department of Criminal Justice, Correctional Institutions Division, does not give rise to liability based on purported "personal knowledge" of the matters contained within that correspondence. There are over 150,000 inmates in the Texas prison system, and thousands of grievances, letters, and complaints are written by inmates each month; the directors and administrators of the prison are not thereby liable for each and every incident raised in these grievances on the basis that they have "personal knowledge" of every matter contained therein. Whitfield has shown that his letter was received personally by Gary Johnson; his claim against Johnson is in reality a claim based upon Johnson's position as Director of TDCJ-CID.

The Fifth Circuit has held that lawsuits against supervisory personnel based on their positions of authority are claims of liability under the doctrine of *respondeat superior*, which does not generally apply in Section 1983 cases. Williams v. Luna, 909 F.2d 121 (5th Cir. 1990). A supervisor may be held liable if there is personal involvement in a constitutional deprivation, a causal connection between the supervisor's wrongful conduct and a constitutional deprivation, or if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind a constitutional deprivation. Thompkins v. Belt, 828 F.2d 298 (5th Cir. 1987).

In this case, Whitfield has not shown that Johnson was personally involved in a constitutional deprivation, nor that wrongful conduct by Johnson was causally connected to a constitutional deprivation. Neither has he shown that Johnson implemented a constitutionally deficient policy which was the moving force behind a constitutional deprivation. Health care in the Texas prison system is provided by a contracting agency, the University of Texas Medical Branch, and there is

no showing that Johnson had the power to implement policies governing the provision of medical or dental treatment to inmates, nor that he implemented a policy stating that permanent caps on teeth would not be provided. Whitfield was seen by the dental department for his tooth, and the determination was that the chip was too small to require treatment; he had made no showing that Gary Johnson was involved in this decision in any way, nor even that policies putatively implemented by Johnson led to this decision. Furthermore, it should be noted that no Fifth Circuit case has ever held that the Director of the Texas prison system can be held personally liable under Section 1983 because an inmate sent a letter to the Director's office complaining about a certain condition, but did not receive a response. Whitfield's claim against Gary Johnson is without merit.

Similarly, Whitfield sued Christina Melton-Crain, whom he identifies as a member of the Texas Board of Corrections, saying that he wrote to her for help in obtaining medical treatment, but did not receive a response. This is not sufficient to show that Melton-Crain was personally involved in a constitutional deprivation nor that wrongful conduct by her was causally connected to a constitutional deprivation. Nor has he shown that Melton-Crain implemented policies relating to dental care, nor that any policies which may have been implemented by her led to the decision that the chip on his tooth was too small to necessitate treatment. In addition, Whitfield has not shown that the decision not to cap his tooth amounted to deliberate indifference to his serious medical needs, rather than mere negligence or a disagreement with medical judgment. See <u>Norton v. Dimazana</u>, 122 F.3d 286, 291 (5th Cir. 1997); <u>Domino v. TDCJ-ID</u>, 239 F.3d 752, 756 (5th Cir. 2001). His claim against Christina Melton-Crain is without merit.

The final Defendant named in the lawsuit is the University of Texas Medical Branch, the contracting agency which provides medical care to Texas prisoners. However, the University of Texas Medical Branch is an agency of the State of Texas, and so Whitfield's claim against UTMB is in effect made against the State of Texas itself. See <u>Ruiz v. Estelle</u>, 679 F.2d 1115, 1137 (5th Cir. 1982) (permitting action for injunctive relief against board members of the Texas Board of Corrections in their official capacity, but denying action against Board itself). A lawsuit against a

state agency is barred by the doctrine of sovereign immunity; the Supreme Court has held that in such a case, when the State itself is the real party in interest named as Defendant, the lawsuit is barred regardless of whether it seeks damages or injunctive relief. Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 101-02 (1984); *accord*, Hafer v. Melo, 112 S.Ct. 358, 363 (1991).

In Kentucky v. Graham, 473 U.S. 159 (1985), the Supreme Court stated that while local governmental units could be sued in their own name for damages or equitable relief, a State may not be sued directly in its own name regardless of the relief sought. Kentucky v. Graham, 473 U.S. at 167 n.14; Amendment XI, *United States Constitution*. Whitfield's claim against UTMB was made directly against the state agency itself. This is the same as a lawsuit against the State in its own name, which is barred by the doctrine of sovereign immunity. Sherwinski v. Peterson, 98 F.3d 849, 851-52 (5th Cir. 1996); *see also* Alabama v. Pugh, 438 U.S. 781 (1978) (per curiam); Delahoussaye v. City of New Iberia, 937 F.2d 144, 146 (5th Cir. 1991). Accordingly, Whitfield's claim against the University of Texas Medical Branch is barred by the doctrine of sovereign immunity and must be dismissed.[2]

## Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees. Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory. Neitzke v. Williams, 490 U.S. 319, 325-7 (1989). A complaint fails to state a claim upon which relief may

---

[2] Whitfield's original complaint included state-law claims, but these claims were dropped from his amended complaint.

be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.  Neitzke v. Williams, 490 at 327, *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Whitfield's claims lack any arguable basis in law and fail to state a claim upon which relief may be granted.  For this reason, his lawsuit may be dismissed with prejudice as frivolous.  *See generally* Thompson v. Patteson, 985 F.2d 202 (5th Cir. 1993).  It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous.  28 U.S.C. §1915A(b).  It is further

ORDERED that any and all motions which may be pending in this action are hereby DENIED.

So **ORDERED** and **SIGNED** this **28** day of **October, 2005.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE